**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

| | | |
|---|---|---|
| **SHELIA DOBBINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:07-0333** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>PROPOSED FINDINGS AND RECOMMENDATION</u>**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. By Standing Order filed May 23, 2007 (Document No. 3.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 11 and 13.)

The Plaintiff, Shelia Dobbins (hereinafter referred to as "Claimant"), filed an application for SSI on May 7, 2004 (protective filing date), alleging disability as of April 28, 2004, due to coronary artery disease (three heart attacks), sugar diabetes, bladder is dropped down, bad nerves, manic depressive, and high cholesterol. (Tr. at 65, 66-69, 76, 79.) The claims were denied initially and upon reconsideration. (Tr. at 39-41, 49-51.) On March 7, 2005, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 52.) The hearing was held on March 2, 2006, before the Honorable Steven A. DeMonbreum. (Tr. at 359-98.) By decision dated May 26, 2006, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 21-31.) The ALJ's decision became the

final decision of the Commissioner on April 11, 2007, when the Appeals Council denied Claimant's request for review. (Tr. at 6-9.) On May 23, 2007, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §416.920 (2006). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. § 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(f) (2006). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to

2

perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v.</u> <u>Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA

determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

4

about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date. (Tr. at 23, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant suffered from coronary artery disease, diabetes mellitus, history of hysterectomy and bladder surgery, obesity, depression, anxiety, and borderline intellectual functioning, which were severe impairments. (Tr. at 23, Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 26, Finding No. 3.) The ALJ then found that Claimant had a residual functional capacity

> to lift, carry, push, and/or pull up to 20 pounds occasionally and 10 pounds frequently, stand and/or walk about six hours in an 8-hour workday, sit about six hours in an 8-hour workday with occasional[] limitations for climbing, balancing, stooping, kneeling, crouching and crawling; and needs to avoid concentrated exposure to extreme cold, extreme heat, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights. Due to the impact of her emotional and intellectual deficits, she needs to avoid complex or detailed work, needs minimal interaction with the general public, and has moderate limitations in ability to respond appropriately to changes in the work setting.

(Tr. at 27, Finding No. 4.) At step four, the ALJ found that Claimant could not return to her past relevant work. (Tr. at 29, Finding No. 5.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a hotel housekeeper and hand packer, at the light exertional level. (Tr. at 30-31.) On this basis, benefits were denied. (Tr. at 31, Finding No. 10.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined

5

as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

Claimant's Background

Claimant was born on July 23, 1955, and was 50 years old at the time of the administrative hearing. (Tr. at 66, 365.) Claimant has a high school education and no vocational training. (Tr. at 30, 86.) In the past, she worked as a cashier/waitress, cleaner, and home health care worker. (Tr. at 29, 80-81, 389-91.)

The Medical Record

The Court has reviewed all evidence of record, including the medical evidence, and will discuss it below as it relates to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in (1) disregarding the findings and opinions of Claimant's treating physicians, (2) assessing Claimant's pain and credibility and failing to consider Claimant's impairments in combination, (3) presenting hypothetical questions to the vocational expert ("VE"), and (4) mechanically applying the Medical-Vocational Guidelines. (Document No. 11 at 5-15.) The

Commissioner asserts that Claimant's arguments are without merit and that substantial evidence supports the ALJ's decision. (Document No. 13 at 5-11.)

1. <u>Treating Physician's Opinion</u>.

Claimant first alleges that the ALJ erred in disregarding the findings and opinions of Claimant's treating physicians, contrary to Social Security Ruling ("SSR") 96-2. (Document No. 11 at 5-10.) Though not clearly stated, it appears that Claimant is asserting that the medical doctors from the West Virginia Department of Health and Human Services ("DHHR"), who certified that she was eligible for social services, including Medicaid, were her treating physicians. (<u>Id.</u>) To this extent, she asserts that the ALJ failed to give appropriate weight to these physicians' opinions. (<u>Id.</u> at 7-8.) Rather, she alleges that the ALJ substituted his own opinion for that of the treating physicians, and asserts that the ALJ should have either re-contacted the DHHR physicians or referred her for a consultative examination. (<u>Id.</u> at 7.)

The Commissioner asserts that Claimant has not demonstrated that the DHHR physicians were "treating physicians" within the meaning of the Regulations. (Document No. 13 at 5.) To the extent that they are treating physicians, the Commissioner asserts that their opinions of disability were conclusory in that they offered no explanation or specific findings or limitations to support their opinions. (<u>Id.</u> at 5-6.) The Commissioner notes that the DHHR physicians' opinions were rendered with respect to Medicaid eligibility specifically, and that two state agency physicians' opinions of record demonstrated that Claimant was capable of performing light exertional level work. (<u>Id.</u> at 6-7.) Regarding Claimant's argument that the ALJ failed to develop the record, the Commissioner asserts that Claimant, through counsel, asserted at the administrative hearing that the record was complete and that she had the burden of proving that she was disabled. (<u>Id.</u> at 7.)

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a

detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2), 416.927(d)(2)(2006).

The medical record contains two disability certification forms from the West Virginia DHHR regarding Claimant's eligibility for social services, including Medicaid . (Tr. at 187-95, 329-40.) The first certification of disability, dated July 21, 2004, was signed by Kathy Shafer, Review Team Examiner, and R. S. Stone, M.D., Reviewing Physician. (Tr. at 188-89.) Attached to the certification was a form General Physical (Adults), which was completed by an unnamed physician at Carilion

8

Roanoke Memorial Hospital. (Tr. at 191.) The form provides Claimant's statement of incapacity or disability due to the following conditions: "CAD, Anxiety/Depression, Hyperlipidemia, DM, Insomnia." (Id.) The physician noted that Claimant had a history of stent placement in April, 2004, but had regular heart rate and rhythm, and a history of coronary artery disease. (Id.) The physician further noted that Claimant suffered from anxiety and depression. (Id.) Also attached to the first certification was a Medical Review Team Transmittal Memorandum, dated May 7, 2004, and Social Summary Outline, dated May 6, 2004. (Tr. at 192-95.) The Outline provides a summary of Claimant's statement regarding her conditions as follows:

> (1.) Tightness of breath (2.) Diabetic (3.) Back through neck and back and shoulders (4.) Tired and fatigued (5.) Trouble sleeping (6.) Nervous leg syndrome (7.) Left arm trying to go numb has lost strength in this arm (8.) Client not allowed to lift even 1 gallon of milk.

(Tr. at 194.) The Outline further provides that Claimant requires assistance in driving, lifting, and vacuuming. (Tr. at 195.) No other documentation was attached or referred to in the certification.

The medical evidence from Carilion Memorial Hospital ("Carilion"), which was submitted separately from the disability certification from the West Virginia DHHR, demonstrates that Claimant was treated at Carilion from April 28, 2004, through May 2, 2004, where she underwent cardiac catheterization. (Tr. at 166-78.) On April 28, 2004, Claimant was admitted to Carilion after having been transported by helicopter for complaints of chest pain and discomfort. (Tr. at 169.) Two days prior to admission, Claimant had experienced mild, upper, substernal chest and jaw discomfort with mild activity. (Id.) On April 28, the discomfort had increased and was associated with shortness of breath and diaphoresis. (Id.) On exam by Rodney Savage, M.D., Claimant's fourth heart sound was heard, though no rubs, murmurs, or clicks were appreciated. (Tr. at 170.) An echocardiography ("EKG") revealed a mild to moderate reduction in left ventricular ejection fraction ("EF") of forty-five percent with segmental wall abnormalities and mild TR with slight pulmonary hypertension. (Tr. at

178.) Dr. Savage diagnosed coronary artery disease with unstable angina pectori for 48 hours and current anterior wall myocardial infarction, diabetes mellitus under poor control, history of hyperlipidemia, and noted that she smoked one pack of cigarettes per day. (Tr. at 170.) On April 29, 2004, left cardiac catheterization was performed. (Tr. at 175-76.) Claimant was discharged from Carilion on May 3, 2004, and was advised to pursue only light activity for the first week and moderate activity thereafter as tolerated. (Tr. at 166.)

Also on April 28, 2004, Claimant was examined by Dr. James Bailey III, M.D., for the assistance with the management of her diabetes. (Tr. at 172-73.) Dr. Bailey noted that Claimant checked her blood sugar levels somewhat infrequently and did not follow a diet or exercise on a regular basis. (Tr. at 172.) He further noted that Claimant's blood sugar levels were aggravated by her then current cardiac illness. (Tr. at 173.) Claimant was discharged from Carilion on May 3, 2004,  with the following diagnoses: (1) Coronary artery disease; (2) Acute myocardial infarction with reperfusion with thrombolytic therapy followed by successful Percutaneous transluminal coronary angioplasty and Cypher (drug-eluting) stent placement; (3) Angina free at discharge; (4) Prior cigarette smoker with mild to moderate chronic obstructive pulmonary disease, currently absent; (5) Hyperlipidemia, on therapy; and (6) Diabetes, on therapy. (Tr. at 166.) She was prescribed Plavix 75mg, Nitroglycerin as needed, baby aspirin, Lopressor 25mg, Captopril 6.25mg, Zocor 40mg, and Insulin NPL/Lispro 75/25. (Id.)

The second certification of disability, dated July 26, 2005, was signed by Kathy Shafer, Review Team Examiner, and an unknown Reviewing Physician. (Tr. at 329-30.) Attached to the certification was a Social Summary Outline, dated March 3, 2005; a form General Physical (Adults), dated June 23, 2005, which was completed by an unnamed physician from Community Health Foundation; and progress notes from Community Health Foundation from February 28, 2000, through June 19, 2003. (Tr. at 335-40.) The Outline provides the following statement regarding Claimant's

conditions: "Claimant had 3 heart attacks in 2004. Diabetic - takes 2 insulin shots per day. Has nerve problems/depression. Recently had 2 pap smears that were abnormal and is scheduled for biopsy on 3-7-05. Stomach problems which she states is caused by her nerve problems." (Tr. at 332.) The Outline further indicates that Claimant lived with her son and left her house only for medical appointments and to shop for groceries, and that her son helped her with housework and cooking. (Tr. at 333.) The form General Physical (Adults) provides Claimant's statement of incapacity or disability due to the following conditions: "CAD, Depression, Anxiety, DM II, Hyperlipidemia, Insomnia, recent Hysterectomy." (Tr. at 334.) The physician noted that regarding Claimant's cardiac condition, she had no clicks, gallops, or murmurs. (Id.) He further noted that Claimant was anxious and had a history of depression and coronary artery disease. (Id.) The medical records attached to the certification reflect diagnoses of diabetes mellitus, menopause, depression, acute bronchitis, upper respiratory infection, incontinence, and dysuria. (Tr. at 335-40.)

The ALJ reviewed and summarized the medical evidence of record, including Claimant's treatment at Carilion and Community Health Foundation, as well as the certifications of disability from the West Virginia DHHR. (Tr. at 24-26, 29.) The ALJ considered the DHHR opinions of disability, noting that the forms were used to evaluate Claimant's eligibility for social services, failed to reveal any significant limitations, and reflected normal examinations. (Tr. at 29.) The ALJ thus accorded little weight to the DHHR opinions because they were "not corroborated by the substantial evidence of record." (Id.)

The ALJ's determination that the DHHR physicians' opinions were entitled little weight is supported by substantial evidence. As the Commissioner points out, the DHHR opinions were made for the purposes of granting Claimant social services, including Medicaid. "A decision by any . . . governmental agency about whether you are disabled . . . is based on its rules and is not our decision about whether you are disabled . . . Therefore, a determination made by another agency that you are

11

disabled . . . is not binding on us." 20 C.F.R. §§ 404.1504; 416.904 (2006). Furthermore, as the Commissioner notes, Claimant has not demonstrated that the DHHR opinions were rendered by treating physicians. From the face of the DHHR certifications, the opinions of disability were rendered by physicians who reviewed medical summaries from Carilion and Community Health Foundation. Moreover, regarding the first certification, the opinion was based on Claimant's one time emergency medical treatment at Carilion and not on any longitudinal treatment. The second certification was based on Claimant's treatment at Community Health Foundation, a treating medical source. However, the ALJ properly found that the DHHR's opinion was not supported by substantial evidence of record. The DHHR opinions consisted of only checked boxes and provided no explanation or specific findings; the opinions were conclusory. The Regulations provide that opinions from medical sources that a claimant is disabled are reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e) (2006). Such opinions do not mean that the Commissioner will determine that a claimant is disabled. Id. Rather, the Commissioner must consider all the evidence supporting the medical source's opinion, as well as all the other evidence of record. Id.

The medical evidence of record reveals that following Claimant's heart catheterization at Carilion, Claimant was treated on June 9, 2004, at Raleigh Heart Clinic with Thair Barghouthi, M.D., for angina pectoris. (Tr. at 179-86.) On examination, Dr. Barghouthi noted Claimant's reports of a few angina pains during the first week of her discharge from Carilion. (Tr. at 180.) Cardiac examination revealed no cardiomegaly or thrills, regular rate and rhythm, and no murmur or gallop. (Tr. at 182.) Her lungs were clear to auscultation and percussion, and her neurological exam was normal. (Id.) Dr. Barghouthi noted that Claimant was oriented times three and had normal mood, affect, memory, judgment, and insight. (Id.) He assessed Claimant with having angina pectoris OT/unspecified; diabetes mellitus, type 2, uncontrolled; tobacco disorder; hyperlipidemia OT/unspecified; chronic obstructive pulmonary disease; and an old myocardial infarction. (Id.) Dr. Barghouthi advised

12

Claimant to stop smoking and instructed her on the use of nitroglycerin pills for chest pain. (Id.) On June 17, 2004, an electrocardiogram revealed moderate global hypokinesis of the left ventricle with an ejection fraction of forty-two percent and mild mitral regurgitation. (Tr. at 185.) The aortic root was normal and there were no signs of pericardial effusion, intracardiac thrombi, vegetation or masses, or intracardiac shunts. (Tr. at 185-86.) A carotid ultrasound doppler on June 23, 2004, was normal.

On August 30, 2004, Claimant was admitted overnight at Logan Regional Medical Center for unstable angina and shortness of breath. (Tr. at 196-215.) Claimant reported substernal chest pain that radiated to her left shoulder which had worsened over the past couple days. (Tr. at 204.) She described the pain as intermittent pressure type pain that worsened with exertion and was relieved with rest. (Id.) On exam, Dr. Robert L. Toparis, D.O., noted that Claimant's heart rate and rhythm were normal, with no third heart sound heard. (Tr. at 205.) Her lungs were clear to auscultation, without wheezing, rales, or rhonchi, and she exhibited no focal neurological deficits. (Id.) He noted that per Claimant's report, her blood sugar levels had been doing well. (Tr. at 204.) An EKG revealed only an old anterior T-wave change but no acute changes. (Tr. at 205.) Dr. Toparis assessed unstable angina and arranged a consultation with Dr. Irfan Admani, M.D. (Id.)

Dr. Admani examined Claimant on August 31, 2004, for her complaints of unstable angina and frequent heart burn. (Tr. at 206-07.) Claimant's examination, including her cardiac exam, essentially was normal. Dr. Admani strongly advised her to stop smoking and recommended a cardiac stress test to rule out ischemia since she had multiple risk factors including diabetes, hyperlipidemia, coronary artery disease, and smoking. (Id.) The cardiac stress test did not reveal ischemia, but indicated a fixed defect involving the apex and anterior apex with corresponding defect on wall motion studies with an EF of forty-nine percent. (Tr. at 211-12.) Claimant was released on August 31, 2004. (Tr. at 197.)

On September 13, 2004, Dr. Gangi Moshin, M.D., noted Claimant's reports of chest pain and heartburn after meals and some abdominal bloating. (Tr. at 242.) Dr. Moshin's physical examination

13

essentially was normal and he advised her to modify her lifestyle, avoid fatty food and caffeine, and stop smoking. (Tr. at 243.) An esophagogastroduodenoscopy ("EDG") on September 17, 2004, revealed mild distal esophagitis, esophageal nodules, and mild gastritis. (Tr. at 239.) Claimant reported on that date that she felt much better and did not experience any chest pain or heartburn, but did complain of abdominal bloating and constipation which was improved with Miralax. (Tr. at 238.) A colonoscopy on October 15, 2004, revealed internal hemorrhoids and an otherwise normal exam. (Tr. at 232.)

On October 13, 2004, state agency medical consultant Rogelio T. Lim, M.D., opined that Claimant was capable of performing light exertional level work with occasional postural limitations. (Tr. at 223-30.) He further opined that Claimant should avoid concentrated exposure to extreme cold and fumes, odors, dusts, gases, and poor ventilation. (Tr. at 227.) He noted Claimant's activities to include laundry, house cleaning, maintaining her personal care, shopping, walking, and driving. (Tr. at 228.) Dr. Lim opined that Claimant's allegations were partially credible on the basis of medical and non-medical evidence. (Id.) On January 31, 2005, another state agency medical consultant, Gomez A. Rafael, M.D., likewise opined that Claimant was capable of performing light exertional level work, with postural and environmental limitations. (Tr. at 270-77.)

The ALJ properly accorded significant weight to the opinions of the state agency consultants as they generally were consistent with the substantial evidence of record. (Tr. at 29.) The state agency medical source opinions identified the medical records reviewed and identified specific limitations, as opposed to the conclusory opinions of the DHHR physicians. Furthermore, the state agency medical source opinions were consistent with the only limiting evidence of record from Claimant's cardiologist that she could resume moderate activity following the first week of her heart catheterization. Based on the foregoing, the undersigned finds that the ALJ's decision to accord little weight to the opinions of the DHHR physicians is supported by substantial evidence.

Regarding the ALJ's duty to refer Claimant for a consultative examination, 20 C.F.R. §§ 404.1517 and 416.917 (2006) provide that

> [i]f your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests.

The evidence of record related to Claimant's physical and mental condition was sufficient from which the ALJ could determine Claimant's limitations. Accordingly, the undersigned finds that the ALJ was not required to order a consultative examination.

2. <u>Pain and Credibility Assessment</u>.

Claimant next alleges that the ALJ erred in rejecting Claimant's credibility. (Document No. 11 at 10-14.) In particular, Claimant argues that the ALJ failed to consider the combined effect of her impairments and that there is evidence supporting Claimant's complaints of shortness of breath, exhaustion, blacking out spells, an inability to perform housework and maintain her personal hygiene, pain and numbness resulting in her often dropping objects, leg pain, kidney problems, concentration and memory problems, and decreased appetite. (<u>Id.</u> at 11.)  The Commissioner asserts that Claimant's arguments are without merit and that the ALJ's decision is supported by substantial evidence of record. (Document No. 13 at 8-10.)

A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged.  20 C.F.R. §§ 404.1529(b) and 416.929(b) (2006); SSR 96-7p; <u>See also</u>, <u>Craig v. Chater</u>, 76 F.3d 585, 594 (4th Cir. 1996).  If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work must be evaluated.  <u>Id.</u> at 595.  When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints

may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative.  Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2006).  Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons.  . . .  Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
>
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2006).

SSR 96-7p repeats the two-step regulatory provisions:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be

16

shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations. A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the

17

allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless, Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms and credibility. (Tr. at 27-29.) The ALJ found, with regard to the threshold test, which is outlined above, that Claimant's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." (Tr. at 27.) The ALJ therefore, proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 27-29.) The ALJ summarized Claimant's testimony from the administrative hearing, including her statements regarding her impairments and symptoms, medications, activities, and functional limitations, noted the requisite factors, and then analyzed them in the opinion, concluding that Claimant's "statements concerning the intensity, persistence, duration and limiting effects of these symptoms are not entirely credible. (Tr. at 20.)

The undersigned finds that the ALJ properly considered the factors under 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4), in evaluating Claimant's pain and credibility. The ALJ acknowledged Claimant's testimony that she experienced occasional chest pain relieved with nitroglycerin tablets, shortness of breath, leg pain, difficulty sleeping, and fatigue. (Tr. at 27, 374-75, 383-84.) He noted that Claimant slept about five hours a night and that she occasionally took a three to four hour nap in the afternoon and had some bladder leakage. (Tr. at 27, 383-84.) Claimant reported that she was treated for nerves and depression, did not want to be around other people, had problems

18

with concentration, and worried about having another heart attack. (Tr. at 27, 377-79, 381, 386.)

Regarding her cardiac condition, the ALJ noted that despite suffering a myocardial infarction on April 29, 2004, she underwent cardiac catheterization, angioplasty, and stent placement, and takes nitroglycerin for chest pain. (Tr. at 28, 166-78.) An EKG in June, 2004, revealed only moderate global hypokinesis with EF of forty-two percent of the left ventricle, and a normal aortic valve. (Tr. at 28, 185.) In September, 2004, an EKG revealed the old anterior T-wave change but no acute changes. (Tr. at 28, 182.) Other objective tests essentially were normal. (Tr. at 28, 184, 211.) The ALJ noted that her blood pressure was within normal limits, that she had normal heart rate and rhythm without murmurs, and lungs that were clear to auscultation. (Tr. at 28, 170, 182, 205, 207, 238, 243.) He further noted that chest pains were relieved with the use of nitroglycerin tablets. (Tr. at 28, 375.)

The ALJ observed that respecting Claimant's diabetes mellitus, type 2, the evidence revealed that it was uncontrolled, but that Claimant failed to follow a diabetic diet or regularly monitor her sugar levels. (Tr. at 28, 172.) He noted that Claimant took insulin and oral medications which resulted in improved sugar levels, without evidence of end organ damage. (Tr. at 28, 169, 172-73, 376.) Though Claimant had bladder leakage, she wore a pad to control the situation and that it did not result in an inability to function. (Tr. at 28, 376.)

Regarding Claimant's psychological impairments, the ALJ noted that though she had been taking an antidepressant since her son's death in 1993, the medication was increased slightly, and she began seeing a psychologist only in November, 2004. (Tr. at 28, 309-21.) The ALJ observed that Claimant's stressors were related to finances and personal family problems, as well as a fear that she would have another heart attack. (Tr. at 28, 216-22, 309-21, 341-46.) Though Claimant reported problems concentrating, the latest psychological examination in November, 2004, revealed good attention and concentration, adequate judgment and insight, and an appropriate affect. (Tr. at 28, 313-

19

19.) While her mood was depressed, the ALJ observed that at the time of the exam, Claimant's son was living with her, as well as her brother whose house was destroyed by fire. (Id.) Moreover, though Claimant was diagnosed with borderline intellectual functioning, she had a high school education; was able to read, drive, and handle finances; and worked semi-skilled jobs during her brief work history. (Tr. at 28, 29-30, 80-81, 86, 219, 315, 385, 389-91.) To accommodate Claimant's mental impairments, the ALJ decided that Claimant needed to avoid complex or detailed work, required minimal interaction with the general public, and had moderate limitations in her ability to respond appropriately to changes in the work setting. (Tr. at 27.)

The ALJ further acknowledged Claimant's reported activities of daily living. (Tr. at 28-29.) Specifically, the ALJ noted:

> [S]he is able to clean her house a little, cook, wash dishes, do laundry, perform self care, read, drive, and walk 100 to 200 feet up hill to her mailbox and back to her mobile home. She lives alone and alleges that she does not want to be around other people, but admits that she had a friend who visits frequently and she sees her two young grandchildren (ages 3 and 4 years old) when her son has custody of them on weekend. She drives to her appointments and takes her medication without assistance. She testified that she does not do the shopping, yet she reported on various forms in connection with her application that she shops for food, clothes, and cleaning supplies about two hours at a time. She also acknowledged that she pays the bills and that she can read and count change. She stays by herself most of the time. She does not have any money and no longer has a social life, but she has a boyfriend who visits. He pays her bills and sometimes stays overnight (Exhibit 4E/4, 9E, 12E, 20F; and Hearing Tape). The undersigned also notes that there is no medical reason for claimant napping three hours in the afternoon except for inactivity.

(Tr. at 28-29.)

Claimant attempts to argue that the ALJ's summary of her activities is based on those activities identified by the state agency physician, Dr. Lim, which statements "are in complete contrast to [Claimant's] own consistent statements concerning her limited activities of daily living." (Document No. 11 at 12.) Contrary to Claimant's assertion, the ALJ's summary of Claimant's activities is

consistent with those activities she reported in the forms accompanying her Applications and those activities to which she testified. (Tr. at 88-95, 96-100, 121-29, 141-43, 376-77, 381-83.) The ALJ's decision was detailed and thorough. Furthermore, it is clear that the ALJ considered each of Claimant's impairments, singly and in combination. Claimant's argument to the contrary is unsupported. Accordingly, the undersigned finds that the ALJ's credibility assessment is supported by substantial evidence and that the ALJ properly considered Claimant's impairments in combination.

3. <u>Step Five Decision</u>.

     A. <u>Hypothetical Question</u>.

     Finally, Claimant challenges the ALJ's step five finding of non-disability in two regards. (Document No. 11 at 14-16.) First, she argues that the ALJ ignored the hypothetical questions posed by her attorney, and consequently, ignored the swelling and fingers of her hands, her concentration problems and inability to handle stress, and the fact that she avoids social situations. (<u>Id.</u> at 15-16.) The Commissioner asserts that Claimant's attorney declined to offer questions to the vocational expert, and notes that Claimant refers to a hypothetical question posed by the ALJ regarding her naps, which the ALJ determined was not supported by the evidence of record. (Document No. 13 at 10.)

     To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. <u>Walker v. Bowen</u>, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities – presumably, he must study the evidence of record to reach the necessary level of familiarity." <u>Id.</u> at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. <u>See</u> <u>Chrupcala v. Heckler</u>, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally,

the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. See Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

As the Commissioner notes, Claimant's attorney declined to question the vocational expert. (Tr. at 397.) In the ALJ's hypothetical questions to the VE, he included all of Claimant's impairments that were supported by the record. (Tr. at 391-97.) The ALJ first asked whether a person of Claimant's age, education, and past relevant work experience, who was limited to performing light exertional level work with occasional postural limitations and environmental limitations including an avoidance of extreme temperatures, vibration, pollutants, poor ventilation, hazards, and heights, could perform any work. (Tr. at 391-92.) In response to the ALJ's hypothetical, the VE responded that such person could perform light housekeeping and janitorial work and hand packing. (Tr. at 392-95.) The ALJ then asked whether any of the jobs identified would be altered if the hypothetical person had moderate difficulty responding appropriately to changes in the work setting. (Tr. at 396) The VE responded that such a limitation would not change the jobs identified. (Id.) Finally, the ALJ asked whether any of the jobs identified would be altered with the inclusion of naps during the day. (Tr. at 397.) The VE responded that if the naps exceeded the normal lunch and other breaks, then there would be no jobs available. (Id.)

The ALJ's RFC findings accommodates the first two hypothetical questions and the ALJ specifically found that the medical evidence did not support Claimant's need to take naps during the day. (Tr. at 29.) Accordingly, the undersigned finds that the hypothetical questions were proper, included those limitations supported by the record, and that the ALJ's decision is supported by substantial evidence.

B. Medical Vocational Rules.

Second, Claimant alleges that the ALJ mechanically applied the Medical-Vocational

22

Guidelines. (Document No. 11 at 14-15.) Claimant asserts that the ALJ noted that she was 48 years old on the alleged disability onset date, which made her a younger individual, but failed to acknowledge that she was 50 years old at the time of the administrative hearing. (<u>Id.</u> at 15.) The Commissioner asserts that the ALJ did not rely upon the grids to direct a finding of non-disability. (Document No. 13 at 10.) Rather, he considered the testimony of a vocational expert and determined that Claimant was capable of performing certain jobs. (<u>Id.</u> at 10-11.)

      As stated above, at step five of the sequential analysis, the Commissioner bears the burden of proving that the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education, work experience, skills, and physical shortcomings. 20 C.F.R. §§ 404.1520(f); 416.920(f) (2006). One way to meet this burden is through the use of the grids. The Regulations establish "grids" which "take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work experience, and residual functional capacity." <u>Grant v. Schweiker</u>, 699 F.2d 189, 191-92 (4th Cir. 1983); <u>see generally</u> 20 C.F.R. Chapter III, Pt. 404, Subpt. P, App.2, §§ 200.00-204.00 (2006). Each grid considers the strength or "exertional" component of a claimant's disability in determining whether jobs exist that claimant could perform in light of the vocational factors. <u>Grant</u>, 191-92; 20 C.F.R. Chapter III, Pt. 404, Subpt. P, App.2, §§ 200.00-204.00 (2006). In a case where the claimant has only exertional impairments, the grids may be applied and vocational expert testimony is not required. <u>See</u> <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1458 (4th Cir. 1990).

      In considering the claimant's age, the Regulations establish particular age categories: (1) younger person (under age 50), (2) a person closely approaching advanced age (age 50-54), and (3) a person of advanced age (age 55 or older). 20 C.F.R. §§ 404.1563(c)-(e); 416.963(c)-(e) (2006). The claimant's age at the time of the ALJ's decision governs in applying the grids. <u>See</u> <u>Varley v. Secretary</u>

23

of Health & Human Serv., 820 F.2d 777, 780 (6th Cir. 1987). At the time of the administrative hearing in the instant case (March 2, 2006), Claimant was 50 years of age. (Tr. at 66, 365.) In his decision, the ALJ noted that Claimant was 48 years old on the alleged disability onset date, and considered her a younger individual. (Tr. at 30.) To this extent, the ALJ noted that if Claimant had the RFC for a full range of light work, "a finding of 'not disabled' would be directed by Medical-Vocational Rule 202.21." (Id.) However, the ALJ correctly noted that Claimant had exertional and non-exertional limitations, and therefore, acknowledged that the grids were not dispositive. (Id.) The ALJ properly considered the testimony of a vocational expert and determined that there were jobs in the economy that Claimant could perform. (Tr. at 30-31.) It is interesting to note nonetheless that had the ALJ considered Claimant an individual closely approaching advanced age, a finding of non-disability would still have been directed under Medical-Vocational Rule 202.14. Accordingly, the undersigned finds that the ALJ properly determined Claimant's non-disability at step five of the sequential analysis and that his decision is supported by substantial evidence.

## PROPOSAL AND RECOMMENDATION

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** Plaintiff's Motion for Judgment on the Pleadings (Document No. 11.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 13.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then

24

ten days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: August 27, 2008.

R. Clarke VanDervort
United States Magistrate Judge